## TEXAS & N. O. R. CO. v. SCHREIBER.

### No. 10005.

Court of Civil Appeals of Texas. San Antonio.

April 21, 1937.

Rehearing Denied May 12, 1937.

Moursund, Ball, Moursund & Bergstrom, of San Antonio, for appellant.

Carl C. Wurzbach and J. L. Camp, both of San Antonio, for appellee.

MURRAY, Justice.

Appellee, Joe Schreiber, instituted this suit in the county court at law No. 1, Bexar county, against appellant, Texas & New Orleans Railroad Company, seeking to recover damages to his home, alleged to have been caused by smoke, soot, and oil negligently emitted from a locomotive engine operated by the servants and employees of appellant.

The trial was before the court, without the intervention of the jury, and resulted in a judgment in appellee's favor in the sum of $115.

The railroad company has prosecuted this appeal.

The first question to be decided is whether or not the evidence is sufficient to show that the emitting of the smoke, soot, and oil was caused by the negligence of the employees in charge of the engine.

The evidence shows that appellee's house was some 100 or 200 yards north of the switch yard of appellant, and that on July 16, 1933, the house, yard, yard fence, and premises generally of appellee were sprayed with smoke, soot, and oil, presumably emitted from an engine operated by appellant's employees in its switch yard.

Mr. Joe Schreiber was not at home when this happened and the only person who undertook to tell how it happened was Mrs. Schreiber, his wife. She testified as follows:

"Q. What is your name? A. Mrs. Joe Schreiber.

"Q. Where do you live? A. 211 Sharer Street.

"Q. You are the wife of Mr. Joe Schreiber? A. Yes, sir.

"Q. On or about July 16th, 1933, what unusual occurrence happened to your house? A. An engine sprayed oil and soot all over the place, the front porch and the furniture that I had on the front porch and all on the yard and the shrubs, it went as far as the kitchen, you can tell it yet, on the white part of the house, it never did come off yet, only what I scrubbed off the floor and porch.

"Q. What time of day did this happen? A. That was around ten, or a little after, something like that.

"Q. Did you see where it came from? A. No, sir, I was busy in the kitchen, but I heard the noise, the way they let out the steam, whatever it is, and the soot and stuff was there after I got there; I got my dinner and went on my front porch and you couldn't touch nothing, the soot was over everything, everything was just covered.

"Q. You did not see the engine? A. No, sir, I heard it, but I didn't see it. You see, I can't see the engine, the cars, or nothing, on account of the houses in front of us, but you can hear the noise all right."

F. L. Carson, master mechanic for the railroad company in July, 1933, testified, among other things, on direct examination, as follows:

"Q. Mr. Carson, in 1933, what operations were carried on in the East Yard adjacent to Sharer street? A. Switching and making up trains.

"Q. That was the East Yards? A. Yes, sir.

"Q. In making up trains is it necessary for a locomotive to be stationed on any particular track near Sharer street for any length of time? A. They switch back and forth through the yard.

"Q. Do you stand any locomotives there whenever they go out on the track? A. When in actual service.

"Q. What sort of equipment do you have on these locomotives in reference to the prevention of soot ejected from the smoke stack—what kind of equipment did you have in 1933? A. A locomotive is equipped with a muffler, an arrester, the front end, so that the smoke and soot—to make this clear I would have to explain this part of it: In this particular case a locomotive coming from the round house to the East Yard, the cylinders are cold and water condenses in the cylinders and when the engine exhausts it throws the moisture out of the stack, whichever way the wind is blowing that moisture will be carried in the air, and there will be small particles or globules of oil in that.

"Q. That is when they come out of the roundhouse? A. Yes. After the engine becomes hot and the cylinders are rather warm, there is no more condensation, and you will not notice that.

"Q. Does that blow off ever occur in the East Yards on the track adjacent to this particular piece of property? A. Those engines coming from the roundhouse to the East Yard?

"Q. I mean do they usually blow off that way when they leave the roundhouse? A. It just comes from the exhaust of the locomotive.

"Q. When does that usually occur? A. While the engine is leaving.

"Q. As it leaves the roundhouse? A. Yes.

"Q. Does that usually occur after they get out on the track? A. Very frequently as far as the East Yard.

"Q. What means has the railroad company taken to prevent that condensation of moisture from being blown out of the stack? A. The only means you can take is to operate the locomotive very slowly and easily throw the moisture into the air any height.

"Q. Are your engineers instructed in that manner? A. Yes, sir."

He testified on cross-examination in part as follows:

"Q. Isn't it possible that a locomotive could have been standing fifteen or twenty minutes, or thirty minutes, then when it started up instead of starting slowly, it gave out a lot of steam and started up suddenly causing this oil to be emitted from the smokestack? A. Well, I would answer that by saying that the harder you work a locomotive the higher the soot goes into the air.

"Q. In other words if a locomotive had been standing there for that length of time, if they started it gradually it would not throw the soot so high? A. That would depend upon the size of the train.

"Q. I mean if an engine is standing there waiting for orders? A. Yes, sir.

"Q. That is possible? A. No, sir. If he had 50 or 75 cars behind it he would have to start slowly, but he would have to work the engine pretty hard, it would throw the vapor very high.

"Q. If the engineer instead of starting up gradually, gives it more steam, then that would naturally throw the soot up higher? A. Yes, sir.

"Q. But isn't it a fact that when he starts the locomotive gradually, it won't throw it so high? A. It depends upon the size of the train, if he had a heavy train, the locomotive would be apt to throw it very high.

"Q. Suppose he had no train? A. Then he could start it very easy.

"Q. But if he didn't do that, it would throw the soot out, wouldn't it? A. Yes.

"Q. You say you didn't know anything of this occurrence on the 16th of July, when this happened? A. No, sir, not at the time.

"Q. Is it possible those things could happen and you would not know anything about it at the time? A. Yes, sir."

It is clear, from the above testimony, that Mrs. Schreiber did not see the engine that emitted the smoke, soot, and oil that was sprayed on her home. She did not attempt to say whether it was an engine pulling a large train, or one without any cars. She did not fix the time definitely, nor did she attempt to state whether it was on the main track or one of the switch tracks. It would seem that if it was a lone engine there would be no excuse for it emitting smoke, soot, and oil with such force as to be blown on appellee's house, but, if it was an engine pulling a heavy train, there would be nothing unusual about the smoke, soot, and oil being discharged with sufficient force that it would go high into the air and be blown as far as appellee's house. It is also clear that the railroad company might have great difficulty in determining which one of its many engines emitted the smoke, soot, and oil that sprayed on appellee's house or at what time or under what circumstances it occurred.

■ These facts fail to show negligence, and we think the circumstances would not justify applying the rule of res ipsa loquitur. In Wichita Falls Traction Company v. Elliott, 125 Tex. 248, 81 S.W. (2d) 659, the court makes a most exhaustive statement concerning the rule of res ipsa loquitur. It is clear from this opinion that, before the rule of res ipsa loquitur can be applied, it must appear that not only the thing which caused the injury complained of must be under the management or control of the defendant, but it must further appear that it is such an accident as does not ordinarily occur in the usual course of things, if proper care is used.

The testimony of Carson shows that the thing here complained of does happen in the usual course of things, even though proper care is used.

The trial court found that the smoke, soot, and oil were emitted from the engine while the same remained idle on the track, but there is no evidence to support this finding, and it must be disregarded.

The rule of res ipsa loquitur is a rule of evidence, and whether or not it applies in a particular case depends upon the peculiar facts and circumstances of each individual case. 45 C.J. 1200. In Goldman, etc., Bottling Co. v. Sindell, 140 Md. 488, 117 A. 866, 871, it is said: "The doctrine involved [res ipsa loquitur] contains no arbitrary or complex formulæ, but is a simple rule of evidence depending upon sound sense and reason, and amounts to no more than this, that where the physical facts involved in an accident are of such a character as to compel an inference that it resulted from negligence, such facts are themselves evidence of negligence."

As the evidence does not show any act of negligence on the part of appellant, and as this is not a case to which the doctrine of res ipsa loquitur applies, the evidence is

insufficient to support the judgment and it must be reversed.

There are other assignments dealing largely with the measure of damages, but, as these matters will not probably arise on another trial, or at least in the same manner, it would add nothing for us to here discuss them.

Accordingly, the judgment will be reversed and the cause remanded.